[No. 1608.]

## HENRY CAMPBELL v. THE STATE.

1. PRACTICE—ASSIGNMENT OF ERRORS.—When error is assigned on the charge of the trial court to the jury, the errors relied upon should be specifically pointed out. The case at bar, however, being a capital conviction, this court waives the insufficiency of the assignment of errors, and scrutinizes the instructions given to the jury, in order to ascertain their accuracy and sufficiency.

2. EVIDENCE.—A fact apparently irrelevant may be made relevant and admissible by other facts with which it is connected by the proof. In the present case, which was a trial for the murder of a policeman, the State was allowed, over objection by the defense, to prove that the defendant, about four hours before the killing, exclaimed, "by G—d, he can't arrest me," but mentioned no name. *Held*, that this exclamation, isolated from all other facts in proof, would not have been legal evidence, but in view of such other facts, it was properly admitted in the present case.

3. MURDER—FACT CASE.—See the evidence upon which a capital conviction for murder is sustained in the present case.

APPEAL from the Criminal District Court of Harris. Tried below before the Hon. Gustave Cook.

The indictment in this case charged that Henry Campbell, the appellant, on March 17, 1883, in the county of Harris, did, of his express malice aforethought, kill and murder Richard Snow, by shooting him with a pistol. The jury found the appellant guilty of murder in the first degree, and assessed his punishment at death.

Austin Johnson was the first witness for the State. He knew the defendant, Henry Campbell, and also the deceased, Richard Snow. On the night of March 17, 1883, the defendant shot the deceased in the head and killed him. It occurred at the house of the witness, in the city of Houston, Harris county, Texas. There was a festival and dance at witness's house the night of the homicide, and the deceased, who was a police officer, came to the house that night for the purpose of preserving order. The killing occurred about eleven o'clock in the night. About ten minutes before it occurred, the witness, who was in his yard, heard the report of a pistol shot inside his house, and immediately some women came running with witness's infant child and

said that officer Snow had shot the child, which had been struck in the hand and slightly wounded.    Witness became greatly excited, and threw off his coat and vest and went at officer Snow to hit him, but was stopped by some one, and Snow said he did not mean to hit the child, but had shot at the man who had knocked him down and beat him for nothing, and that if witness would send for a doctor he would pay all expenses.    This satisfied the witness, and while he and Snow were still talking, the defendant, Henry Campbell, came up and pointed his pistol at Snow, and tried to fire.    The pistol snapped and was withdrawn by the defendant, but he again pointed it at Snow and fired. The bullet struck Snow in the left eye, and he fell, and the defendant ran off.    When Snow was shot he was leaning against a tree in the yard and was talking to witness, who was five or six feet in front of him.    Witness did not hear the defendant say anything when he shot the deceased.    Defendant came up behind the witness and passed in front of him when he, defendant, shot the deceased, who was leaning with his back against the tree, with his face toward the house, and who was four or five feet from defendant when the latter shot him.    Witness was excited at that time, and consequently could not remember well what he then said; but he did not try to shoot the deceased. Snow, the deceased, was doing nothing to the defendant when the latter shot him.    Witness heard them quarrelling in the house, but did not know that the deceased tried to arrest the defendant, nor what he wanted to arrest him for.    When Snow came to the house he said he was looking for a man named Henry Marshall.    He stopped and talked to witness at the gate, and then went on the front gallery, and to or toward the door of the right hand room of the house, which had two front rooms and an "L."    When the pistol was fired in the house he came off the gallery and into the yard.    Witness did not go into the house nor on the gallery; the child was brought out to him.    The gate is about four yards from the gallery.    The tree against which the deceased was leaning when shot stands near the fence and on the left of the gate.    The defendant ran up and shot the deceased.    Witness denied that, in his testimony at the examining trial of this case, he stated that there were a thousand people at his house the night of the homicide.    In the progress of the case the defense introduced the written testimony of this witness at the examining trial, and according to it he swore on

that trial that there were probably a thousand people at his house the night in question.

John Green, for the State, testified that he was at Johnson's house when Richard Snow was shot and killed by the defendant. Snow was standing against the fence, talking to Johnson. The defendant came up and pointed his pistol around the tree, and snapped it at Snow. Defendant recovered the pistol, presented it again at Snow, and fired. Defendant said: "Shoot the d——d son of a bitch." The ball struck Snow in the eye, and he fell. When shot he was doing nothing to the defendant, either by act or word. The witness saw the defendant distinctly, and knows positively that it was the defendant who shot Snow. The latter was put on a dray and taken to his home, where he died the next day. A pistol was fired inside the house some five or six, perhaps ten minutes before the defendant shot the deceased. It was about eleven o'clock in the night when the deceased was shot. Counsel for the State asked the witness if he, before the shooting, but on the same evening, saw the defendant and heard him say anything, and what? The defense objected to the question, but the court overruled the objection, and the defense reserved exceptions. In reply to the question, the witness stated that he did see the defendant at Gordon's store, about seven o'clock, and heard the defendant say, "by G—d, he can't arrest me." Defendant called nobody's name. Later in the evening witness went to the house of Austin Johnson, and there learned from policeman Humble that he had warrants for the arrest of some parties. Witness and Humble stepped off to examine the warrants and ascertain who the accused parties were. After examining the warrants the witness went into the house, passing through the left hand front room, and there saw Snow, the deceased, sitting on the bed. When the child was shot the witness was in the back part of the house, and he did not know whether or not the defendant was then in the house. Witness immediately came out of the house into the yard, and there found Austin Johnson with his coat and vest off, talking to Snow, the deceased. Johnson was making no threats, but he told Snow that he ought not to have shot in the house. Snow was standing five or six feet from the tree and facing it. The defendant ran up by the tree and put his pistol around it, and fired at Snow, who was shot on the left side of the head near the eye. Deceased fell immediately but got up in about five minutes, and the witness set him up against the fence. Ten or fifteen min-

utes afterwards he was carried off on a dray.   Defendant drew his pistol when he was about three yards from the deceased, and said: "Kill the son of a bitch."   Deceased was looking at and talking to Austin Johnson, who stood directly in front of him, and who saw him shot.   As the witness passed through the room in which the baby was shot he saw some women there. Johnson was excited when witness saw him and Snow together. Witness told Johnson to be cool.  The moon was shining.   Johnson said nothing when the defendant said: " Shoot the son of a bitch."

Sol. Jackson, for the State, testified that he was at Austin Johnson's house the night officer Snow was killed there.   Henry Campbell, the defendant, was the man ₃who killed him.   When the pistol shot was fired in the front room of the house, witness was in a rear room where the dancing was going on.   Witness, as he jumped off the gallery, saw the defendant come running from around the house into the front yard.   The defendant, with a drawn pistol in his hand, ran past the witness, to a china tree near the gate, and shot the deceased.   He snapped his pistol first, and then revolved it and fired.   Witness was so scared that he ran back into the house.   When the defendant shot the deceased they were five or six yards apart, and the deceased was backing.   The witness denied that in his testimony at the examining trial he stated that the china tree was the one which stood near the gallery, instead of the one near the fence, and also denied that he stated at the examining trial that the tree was about fifteen feet from the fence.   These denials of the witness were contradicted by the written testimony at the examining trial, which was introduced by the defense at a subsequent stage of the trial.

Mrs. Snow, the widow of the deceased, testified that he was shot in the right eye, and to the same effect was the testimony of J. J. Fant, who examined the wound after the death of the deceased.   With the foregoing evidence the case was closed by the prosecution.

Dr. J. A. Throckmorton was the first witness introduced by the defense.   He testified that he was, and for many years had been, a practicing physician, in the city of Houston.   He was called to see the child of Austin Johnson, March 17, 1883, when it was shot.   The wound was a mere scratch upon the hand of the child. · Witness and Doctor Heard went to see officer Snow, who had been shot in the left eye, just under the brow and close

to the nose. The ball, witness thought, ranged outwards and lodged in the back part of the head. He did not probe deep for the ball. The shot must have been fired by some one who was in front of the deceased. The ball passed along a right line, a little inclined to the left. Witness's present recollection was that there was no powder burn, but he admitted that his memory on that point was not so good as it was when he testified before the examining court, and said that if he had stated at the examining trial that the wound was powder burned, that statement was correct, and his present recollection defective. It is not possible to powder burn a person by the discharge of a gun or pistol, unless the weapon is held almost against such person. Witness stated this, however, as a professional opinion only. He had never verified it by experiment, and the opinion of any one else was as good as his on the matter. The written testimony of this witness at the examining trial was introduced by the defense. According to it the deceased was powder burned.

J. W. Edmondson, for the defense, testified that he had known the defendant for many years. Defendant had worked on witness's place, in Waller county, for some years, and bore the reputation of being a quiet, inoffensive, law abiding man. Witness had never known of any charge against the defendant until the present one.

Joe Haverly, for the defense, testified that he was at Austin Johnson's when officer Snow was killed. There were a good many colored people in the house and yard at the time. Witness heard a pistol shot in the house and learned that Johnson's child was shot. There was a good deal of excitement, and some of the women were crying and shouting. Witness did not see who shot officer Snow. He saw the group around Snow when he was shot, but did not see the defendant among them.

Oliver Holmes, for the defense, testified that he was at Johnson's when Snow was killed. The defendant was there. About ten minutes after the baby was shot in the house the witness saw Snow in the yard, but was not nearer to him than three yards. Johnson was talking to Snow when the latter was shot. Witness did not see who shot Snow, and did not see the defendant elsewhere than in the house. The shot came from Snow's right side. Witness did not hear any one say, "kill the son of a bitch."

Sam. Massie and Calvin Williams, for the defense, testified

that they were present when Snow was shot, but did not see who shot him.

Ann Jackson, for the defense, testified that she was at Austin Johnson's the night Snow was shot. Witness had Johnson's little baby in her arms, and was sitting in the front right hand room, where no dancing was going on. She saw Snow standing in the door. The defendant started to go out, and Snow asked him if he was Henry Marshall. Defendant said deceased was mistaken in the man, and asked deceased to stand back and let him come out. Deceased had a walking stick in his hand, and struck the defendant with it twice and told him to give back. Deceased drew his pistol and shot at the defendant, and was then right up close to the defendant. The ball missed the defendant and struck the baby in the thick part of its hand. Witness handed the baby to another woman and got out of there as quick as she could. Defendant was asking the deceased to let him come out, and he was going out when the pistol fired. "That is the kind of scuffle they were in." Defendant had no pistol, so far as the witness knows, nor did she know where he went to after Snow fired his pistol. She did not see defendant strike the deceased, and the latter did not tell the defendant to keep quiet. Witness was not present when the defendant shot Snow.

Maggie Henderson, for the defense, testified that when officer Snow was killed she lived directly across the street from Austin Johnson's, and her gate was directly opposite Johnson's gate. It was a moonlight night when Snow was killed, and witness could see distinctly across the street, which was not wider than the court room. She was ironing in her house, with the windows open, when she heard a shot in Johnson's house. She knew it was fired in the house because it sounded as if fired in a barrel. Immediately after the shot, she heard Mary Jane Mays and Mary Fuller, whose voices she recognized, and who are sisters of Austin Johnson, shouting: "Brother Austin, there's no law in this country for shooting a six week's old baby, and if you haven't the money to stand it we will help you." Witness saw a tall, slender man pull off his coat and make for the man who had on a blue suit of clothes, who backed as the tall man ran right up to him. The tall man was right close to the man in blue clothes, or had him by the collar, when the witness saw a ball of fire right between them. It came right from the tall man who was in his shirt sleeves, and the man in blue clothes fell. It seemed

to witness that the shooting was done by the tall man, but she would not say for certain that it was. It did not come from any such a looking man as the prisoner there. Deceased was shot within a very few minutes after the shot was fired in the house. Ten or fifteen minutes after he was shot, the people at Johnson's put him on a dray and carried him across the street and near witness's house, and the women came over and kicked and stamped him. After a while witness helped him up, and he went down the street, tottering along, as far as the corner of the block on which the witness lived.

The evidence was closed by the introduction by the defense of the written testimony given by the State's witnesses, Johnson, Green and Jackson, at the examining trial of the cause, between which and their testimony at bar some discrepancies appeared.

The opinion of this court shows the grounds relied upon by the appellant.

No brief for appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. This appeal is from a conviction of murder in the first degree, the penalty being assessed at death.

On the night of March 17, 1883, the appellant, Henry Campbell, shot and killed Richard Snow, in the city of Houston, at the house of one Austin Johnson, at which place there was a festival and dance. For this homicide he was indicted, tried and convicted of murder in the first degree, the jury inflicting the highest penalty known to the law, to wit, death.

Judgment being rendered upon this verdict, Campbell appeals to this court, and for reversal of the judgment assigns thirteen reasons. We will consider these assignments in the order presented in the assignment of errors.

1. "The court erred in its charge to the jury." In what respect the charge is incorrect or erroneous is not stated. Though the supposed error is not specifically pointed out to us, we have nevertheless carefully examined the charge, not alone in the light of the general tendency of all the evidence, but in the light of each and every phase of the case presented by any part of the evidence. And after a most thorough examination of the charge, we have not discovered an error in it. It, in a plain,

clear and concise manner, applied the law not only to *the case* presented by the great preponderance of the evidence, but to each and every theory supported by the evidence.

2. "The court erred in permitting the district attorney to prove by Johnson that, on the evening before the shooting, the witness, Johnson, saw the defendant about seven o'clock at Gordon's store, and that he, defendant, said, 'by G—d, he can't arrest me!' No one was mentioned by the defendant." Isolated from the other facts of the case, this was not evidence. Viewed in the light of and in connection with other evidence adduced on the trial, we have no doubt of its relevancy. An irrelevant fact becomes relevant and of the highest importance because of another fact with which it is connected in the proof. By an inspection of the statement of facts, the relevancy of this evidence will very clearly appear.

3. "The judgment of the court is contrary to law." In what particular? The appellant is adjudged to be guilty of murder in the first degree, as found by the jury.

We will consider the fourth, fifth and sixth assignments together. The fourth is that "the judgment of the court is contrary to the evidence." The fifth is that "the verdict of the jury is contrary to the law." The sixth is "that the verdict of the jury is contrary to the evidence."

That the judgment of the court may, in one sense, be contrary to the evidence is true, but if in proper form we would attack the verdict of the jury—its basis. That the verdict of the jury may be contrary to or not supported by the evidence may also be true, but if the verdict is, in form, a legal verdict abstractly considered from the evidence, we would rely upon the sixth assignment, which is that "the verdict of the jury is contrary to, and is not supported by the evidence."

Is this verdict supported by the evidence? This question presents the only debatable issue in the case. This conviction being for murder of the first degree, the evidence must show that the killing was upon express malice; in other words, that the defendant, with a sedate and deliberate mind, and formed design, shot and killed Richard Snow. What evidence is required to show such a mind, and such a design? This formed design is evidenced — shown — by external circumstances, discovering (showing) this inward intention; such circumstances as lying in wait, antecedent menaces, former grudges, and concocted schemes to do deceased some bodily harm. Now, while it is

true that the circumstances, to-wit, lying in wait, antecedent menaces, former grudges and concocted schemes to do the deceased some bodily harm, are facts from which this formed design may be inferred, they nor either of these facts are absolutely necessary to prove such a state of mind and such formed design. "For although a killing be upon a sudden difficulty, it may be attended with such circumstances of enormity, cruelty or deliberate malignity, cool, calculating compassings, or even calm demeanor and absence of passion, as will be sufficient evidence to establish the inference that the killing was the result of a sedate, deliberate mind, formed design to take life and do some great bodily harm." "Even in a case of a sudden killing, in the absence of previous ill feeling, or where it is too slight to be presumed to be the motive for the act, then there may often be found ample evidence of express malice in the means used, or manner of doing it. For a man is always presumed to intend that which is the necessary, or even probable, consequences of his acts, unless the contrary appears." If, therefore, the calm and sedate mind and formed design can be shown by the instrument or means used, and the manner of the killing, if in any case express malice can be evidenced by this character of proof, evidently and very clearly there is ample proof in the manner of this killing and the means used to destroy the life of the deceased, Richard Snow. For this homicide was attended with circumstances which show a calm, deliberate demeanor, and absence of passion, with cruel and deliberate malignity. We are of the opinion that the verdict of the jury is supported by the evidence.

The seventh, eighth, ninth and tenth assignments present the same question, but in different form, as the sixth, namely: Is the evidence sufficient to support the verdict?

The eleventh is: "The verdict is excessive, and not at all proportioned to the offense proven, if any proven."

We believe that the evidence well warranted the jury in finding the defendant guilty of murder of the first degree, and, this being the case, it was the province of the jury to determine what should be the punishment. They have selected the highest. The evidence supporting a verdict of murder in the first degree, and death being one of the penalties of such a murder, this court will not interfere with their verdict.

12. "The court erred in overruling the motion for new trial for the reasons set out in said motion." There is no matter

urged in the motion for new trial which is not insisted upon in the assignments of error; and in passing upon the assignments all of the reasons for new trial have been considered.

13.  "Many other reasons apparent of record." We have not confined ourselves to the assignments of error made by counsel for appellant, but have given this record our most careful consideration, in order that this court may be satisfied that the appellant has had a fair trial, and that his conviction has not only been obtained by the due and proper process of law, but that, in fact, legal proof has been made of his guilt of the crime found by the verdict of the jury, for which he is to suffer death.

Our conclusion, from a thorough examination of the record, after mature reflection, is that appellant has had a fair trial, and has been convicted legally, and that the conviction is warranted by the proof. This being the case, our duty to society imperatively demands that the judgment be affirmed.

The judgment is affirmed.

*Affirmed.*